**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | | |
|---|---|---|
| **FIRST SOLAR ELECTRIC, LLC,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION NO. 5:21-cv-408 (MTT)** |
| | ) | |
| **ZURICH AMERICAN INSURANCE** | ) | |
| **COMPANY,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## ORDER

Plaintiff First Solar Electric LLC ("First Solar") filed this action seeking

determination of its rights under a Master Builder Risk ("MBR") Policy issued by

defendant Zurich American Insurance Company ("Zurich") following five rain events[1]

that caused significant damage to a solar field First Solar was building.  Doc. 1.  Zurich

moves for summary judgment arguing, among other things, that the damage to the solar

field resulted from five separate occurrences of "flood" and that the $2,500,000 flood

deductible applies.  Doc. 88.  First Solar moves for partial summary judgment arguing

that the flood deductible is $100,000 or, in the alternative, that the "water damage"

deductible should apply.  For the reasons that follow, First Solar's motion (Doc. 90) is

---

[1] Reluctantly, the Court follows the parties' lead and calls the heavy rainstorms "rain events."  The Court notes that "rain events" appears to be a defined "technical" term: "Rain event is defined as continuous rain, and resets to zero if accumulated rainfall is less than 1 mm (0.039 in) in a 24 hour period."  *Rain Increment Definitions*, Ambient Weather Support, https://ambientweather.com/faqs/question/view/id/1454/ (last visited June 13, 2024).  Neither party relies on this definition and neither does the Court.

GRANTED in part and DENIED in part and Zurich's motion (Doc. 88) is GRANTED in part and DENIED in part.

## I.  BACKGROUND[2]

### A.  The Twiggs Project and Flood Zone Determination

#### 1.  Preliminary pricing

In February 2018, First Solar entered into an agreement with Twiggs County Solar LLC to provide engineering, procurement, and construction services for a solar farm in Twiggs County, Georgia (the "Twiggs Project").  Docs. 88-2 ¶¶ 1-3; 100-1 ¶¶ 1-3; 101-10.  On July 20, 2018, Hector Mestre, First Solar's insurance broker, requested "a premium indication for the Twiggs Project based on a completed Builder's Risk Insurance Information questionnaire."  Docs. 88-12; 102-1 ¶ 48; 115 ¶ 48.  First Solar's questionnaire provided the project location using the coordinates latitude 32.59108, longitude -83.445652.  Docs. 88-12 at 3; 102-1 ¶ 48; 115 ¶ 48.  On the same day, "John Hernandez, Zurich's underwriter for the Twiggs Project, responded" to Mestre's request with "preliminary pricing."  Docs. 90-12 at 2; 102-1 ¶ 50; 115 ¶ 50.  "Hernandez noted that the preliminary pricing conservatively used Flood [Level] 1,"—i.e., properties with the highest risk of flooding—but that he would need the "exact location and footprint of the project" to determine the applicable flood zone and associated deductible.  Docs. 90-12 at 2; 102-1 ¶ 50; 115 ¶ 50.

---

[2] Unless otherwise stated, the facts are undisputed and are viewed in the light most favorable to the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The Court notes that parties repeatedly purport to "dispute" various facts, but they really argue the legal conclusions that should be drawn from the facts.  *See, e.g.*, Doc. 100-1 ¶ 44.  As outlined in Local Rule 56, the Court will not consider "statements in the form of issues or legal conclusions."

On July 24, 2018, Mestre emailed Hernandez with additional information and requested "that a project certificate be issued with certain coverage limits, sublimit, and deductibles."  Docs. 90-14 at 4-5; 102-1 ¶ 51; 115 ¶ 51.  While Mestre requested a $100,000 flood deductible, he asked Hernandez to "confirm which Flood deductible is to apply depending on the zone."  Docs. 90-14 at 5; 102-1 ¶ 52; 115 ¶ 52.  Mestre also noted that he was requesting an Estimated Major Loss ("EML") report to further analyze the potential risk of loss from flooding and advised that "depending on the outcome, [First Solar] may come back to [Zurich] asking to revise the flood or named storm sublimit."  Docs. 90-14 at 5; 102-1 ¶ 65; 115 ¶ 65.  After comparing the Twiggs Project site map with a flood map, Hernandez determined that the project was in Flood Zone A, a subset of Flood Level 1.  Docs. 90-4 at 68; 102-1 ¶ 53; 115 ¶ 53; *see also* Doc. 84-1 at 55:5-16, 87:13-88:3.

### 2.  The project certificate

On July 26, 2018, Hernandez informed Mestre "that the Twiggs Project would be subject to the 2% deductible (subject to a minimum of $250,000 and maximum of $2.5 million)."  Docs. 90-14 at 2-3; 102-1 ¶ 56; 115 ¶ 56.  Mestre asked for confirmation on the flood zone stating, "I wasn't sure about the Flood Zone, so it is Zone A then?"  Doc. 90-14 at 2.  Hernandez responded, "That's correct.  A significant amount of the project is located in the 100 year flood plain."  *Id*.

On July 27, 2018, Zurich issued a project certificate to First Solar "with a Certificate Period of August 1, 2018, to July 31, 2020."  Docs. 1-3; 102-1 ¶ 58; 115 ¶ 58. "The location of the Twiggs Project specified in the project certificate is the pair of coordinates of '32.59108 degrees' and '-83.445652 degrees,'" the same coordinates

First Solar provided in its initial questionnaire.  Docs. 1-3 at 2; 88-2 ¶ 16; 88-12 at 3;

100-1 ¶ 16.  The certificate included a flood deductible "of 2% (subject to a minimum of

$250,000 and maximum of $2.5 million)."  Docs. 1-3 at 3; 102-1 ¶ 62; 115 ¶ 62.  Mestre

forwarded the project certificate to First Solar's risk manager and stated:

> One thing I wanted to point out is that Flood deductible which is 2%
> subject to the minimum $250,000 and maximum $2.5M as Zurich
> confirmed the majority of the project is located in high hazard flood zone.

Docs. 88-62 at 2; 102-1 ¶ 61; 115 ¶ 61.

### 3.  The EML report

On September 5, 2018, Zurich sent First Solar the EML report.  Doc. 90-16 at 3-

12.  The EML report noted that the risk of flooding was "high":

> [T]he project site is located in FEMA Flood Zone X, unshaded, with the
> eastern portions of the site adjacent to Flat Creek which is in FEMA Flood
> Zone A.  Flood Zone X, unshaded is defined by FEMA as an area outside
> the 0.2% annual chance (500-year) floodplain.  Flood Zone A is defined by
> FEMA as a special flood hazard area subject to inundation by the 1%
> annual chance (100-year) flood.
>
> …
>
> It is assumed that First Solar will set back the solar field at a distance of at
> least 50 feet from Zone A as has been typical of previous projects with
> similar hydrology.  However, without appropriate flood control measures in
> place, flood depths reaching 13 feet could potentially engulf some areas of
> the solar field adjacent to Flat Creek. The AECOM memo does not provide
> flood exposure abatement recommendations but does recommend further
> drainage studies.  It is understood that a complete Drainage Study is
> being prepared and it is assumed that First Solar will implement measures
> that will minimize identifying post development flood exposures to the
> solar field.

*Id*. at 9.  First Solar did not follow up with Zurich after the EML report to revise the flood

deductible.  *See* Docs. 102-1 ¶ 66; 115 ¶ 66.

**B.  The Rain Events**

The Twiggs Project experienced five separate, heavy rain events "that occurred on or around December 13, 2019; February 5, 2020; February 13, 2020; March 3, 2020; and April 18, 2020."  Docs. 88-2 ¶¶ 31, 33; 100-1 ¶¶ 31, 33 ("It did not rain continuously at the Twiggs Project from December 13, 2019 until April 18, 2020.").  Each rain event resulted in rainwater "accumulat[ing] on and diffus[ing] over the ground," damaging solar arrays, access roads, security fences, grading, and other civil, structural, and electrical works.  Docs. 88-2 ¶¶ 39-40; 90-2 ¶ 26; 100-1 ¶¶ 39-40; 102-1 ¶ 26.  Although "[t]he Twiggs Project occupied normally dry land," photographs of the solar field show portions of the project underwater after the rain events.  Docs. 102-1 ¶ 47; 115 ¶ 47; *see, e.g.,* Docs. 88-25 at 11-22 (photographs following December 2019 and February 2020 rain events); 88-26 at 5-9 (photographs following December 2019 rain event); 88-27 at 3-4 (photographs following December 2019 rain event); 88-28 at 4-13 (photographs following February 2020 rain events); 88-29 at 4-5 (photographs following March 2020 rain event).






Doc. 88-26 at 5; *see also* Docs. 90-7 at 79:5-6 (discussing Doc. 88-27 "Q: What do you see in that picture?  A: I see water on the surface."); 90-20 at 102:13-18 ("Q: Do you recall in your drive around the property after the February the 13th, 2020 rain event that the modules in block two, array four were under water? … A: Yes, I believe so.").  After each rain event First Solar performed necessary remediation, including "pump[ing] out" standing water, and then resumed working on the project.  Docs. 88-2 ¶¶ 41, 44, 47; 100-1 ¶¶ 41, 44, 47.  "At the time of the first rain event on December 13, 2019, the 'total project value in place' was, at minimum, $141,900,000.00."  Docs. 102-1 ¶ 100; 115 ¶ 100.

"First Solar provided notice to Zurich of the five rain events on December 20, 2019, February 19, 2020 (both February 2020 rain events), March 18, 2020, and April 22, 2020."[3]  Docs. 88-2 ¶ 32; 100-1 ¶ 32.  Zurich adjustor Scott Klaben was assigned to handle all of First Solar's claims.  Docs. 82-2 ¶ 28; 103-1 ¶ 28.

## C.  Claims Investigation and Communications

On February 7, 2020, Klaben visited the Twiggs Project to inspect the damage.  *See* Docs. 88-2 ¶ 71; 86-1 at 201; 90-20 at 88:20-22, 89:9-12; 100-1 ¶ 71.  John Shaw, First Solar's insurance broker, testified that he had "several" conversations with Klaben during which Klaben stated that First Solar's claims "were going to be viewed as water damage claims."[4]  Doc. 90-22 at 50:24-51:24, 52:25-53:3.  Consistent with these

---

[3] "When rainstorms occurred on and off over the course of a few days, First Solar elected to attribute losses from those days into a single rain event with a single date of loss for purposes of submitting its losses to Zurich."  Docs. 88-2 ¶ 50; 100-1 ¶ 50.

[4] Zurich objects to this testimony as "inadmissible hearsay."  Doc. 102-1 ¶¶ 32-33.  But Klaben was a Zurich employee at the time these statements were made.  Docs. 82-2 ¶ 28; 103-1 ¶ 28.  As a result, these statements are admissible under Federal Rule of Evidence 801(d)(2).

representations, Klaben, on February 8, 2020, noted in First Solar's claim file that "[t]his loss if [sic, presumably] for water damage to the roads and washed out areas around the solar paneling support array for this Builder's Risk claim" (Doc. 86-1 at 201); on February 20, 2020, Klaben recorded the February 5 loss in his claim notes, answering "No" to the question "Was the loss caused by flood?" (Doc. 86-2 at 4); and in a February 21, 2020 email to a Zurich claims manager Klaben noted that "[e]ach claim carrie[d] a $100K deductible."  Doc. 90-28 at 3.

On June 10, 2020, Klaben approved a "$200K advance [payment] request" for the first three rain events, noting that "claimed damages per Insured = $577K and so less $100K deductible we noted/in agreement with insured for $200K advance request." Docs. 88-2 ¶ 69; 86-1 at 196; 100-1 ¶ 69.  "On June 11, 2020, Zurich … issued three checks each for $200,000, representing advance payments for the rain events of December 13, 2019, and February 5, 2020, and February 13, 2020."  Docs. 90-2 ¶ 29; 102-1 ¶ 29.

On August 4, 2020, Klaben sent First Solar "a status report and update on the ongoing string of weather-related claims," which noted, for the first time, the potential application of the flood deductible:

> As Zurich American Insurance Company continues to gather information for these claims and will continue to do so under a full reservation of rights, we direct your attention to the following pertinent Policy language:
>
> Our review of the Project Certificate (CER 500 (1.0-1.0) noted on page 2 of 4 that the policy carries a Flood policy minimum deductible of $250,000

---

Furthermore, although Zurich moves to strike portions of Shaw's testimony as impermissible opinion testimony improperly disclosed under Federal Rule of Civil Procedure 26(a)(2)(C), it "takes no issue with [] Shaw being presented to testify as a lay witness about his personal involvement with First Solar's insurance claims as First Solar's claims advocate."  Docs. 70; 104 at 2-3.  Thus, to the extent the Court relies on portions of Shaw's testimony, it considers only his personal experience assisting with First Solar's claims.

and up $2,500,000 which would be based on 2% of the value of the completed project at the time of the loss.

We also wanted to bring to your attention out [sic] that the policy definition of a flood loss is defined on page 17 and 18 of 21 in the Builders Risk policy[.]

…

Additional[ly], if you possess other documents that you feel would help us in the investigation of the claim, please feel free to forward them along as well.  Please keep in mind since the claim is still pending there may be additional requests in the future.

Zurich American Insurance Co. continues to reserve all of its rights under the Policy, and no act of any Zurich American Insurance Co. representative or agent, while investigating, discussing the claim or defending a lawsuit, shall be construed as waiving any rights, including the right to deny coverage or dispute the amounts claimed.

Doc. 90-30 at 2-3.  On October 20, 2020, Shaw responded to Klaben's letter outlining "multiple reasons why the definition of FLOOD*" did not apply to First Solar's claims.

Doc. 90-31 at 2-3.  From October 2020 to February 2021, Zurich continued to adjust First Solar's claims.  Docs. 90-2 ¶ 41; 102-1 ¶ 41.  Specifically, Zurich's third-party building consultant, MKA, continued to verify First Solar's losses.  Docs. 90-2 ¶ 41; 102-1 ¶ 41; *see also* Doc. 89-8 at 103:21-104:6, 141:7-9.

By early March 2021, First Solar was getting "anxious" because it had not received a response from Zurich to its October 20 letter.  *See* Doc. 90-33 at 2.  On March 8, 2021, Shaw followed up with Klaben about the status of First Solar's claims:

When last we spoke about the response to First Solar's position on the application of the flood deductible and the number of occurrences, you advised that you expected to have a response out last week.  I haven't seen anything yet, so just checking in.  I have a conference call with [First Solar] at 11 AM my time/ 2 PM your time. It would be great if we could talk before then.

*Id*. at 3.  Klaben responded on March 15, 2021: "Still working on it."  *Id*. at 2.

On March 22, 2021, Anthony Morris, Zurich's outside counsel, sent a letter to Shaw "confirming Zurich's position that the 'flood' deductible applies to each rain event individually, and Zurich's determination that it owes nothing under the policy."  Docs. 88-2 ¶ 92; 90-34; 100-1 ¶ 92.  "First Solar understood Zurich's March 22, 2021 letter to convey Zurich's 'ultimate determination that [it] was not planning to pay any additional amounts under the Policy.'"  Docs. 102-1 ¶ 85; 115 ¶ 85.  On May 10, 2021, Alex Purvis, First Solar's attorney, replied to Zurich's March 22 letter and triggered the policy's alternative dispute resolution procedure:

> I have reviewed your March 22, 2021 letter and respectfully disagree with your conclusion that these losses from heavy rainfall clearly and unambiguously fall within the meaning of "Flood" as that term is defined in the Policy.  I also disagree with your suggestion that First Solar's view of that issue is unreasonable, particularly when Zurich made prior claim payments consistent with First Solar's interpretation.
>
> Given our clients' dispute and Zurich's response, First Solar elects and requests to proceed pursuant to the alternative dispute resolution procedures set forth in Paragraph 23 of the Policy.  Per the Policy, the parties must now jointly select an alternative dispute resolution technique. First Solar's preference is arbitration using a panel of three arbitrators. We recommend that each party select one arbitrator, with the chair or umpire selected by the parties' respective selected arbitrators.  There are other details we will obviously need to work through, and we look forward to discussing that with you soon.

Docs. 88-2 ¶ 95; 88-60 at 2-3; 100-1 ¶ 95.  When Morris proposed resolving the dispute using a "mini-trial" procedure, he assured First Solar, *without qualification*, that if the parties could not come to an agreement they would be "free to pursue judicial resolution of the dispute."  Doc. 100-5 at 2.  After the parties agreed to mediate the dispute, Morris, on July 8, 2021, qualified Zurich's position on tolling: "With regard to your prior question about tolling, we agree that any claim(s) that were not time barred as of May

10, 2021, the date First Solar requested ADR, are tolled pursuant to the ADR provision G."  Doc. 100-6 at 2.

The mediation was ultimately unsuccessful and on November 12, 2021, First Solar filed suit.  Doc. 1.  First Solar's complaint alleges five claims: (1) declaratory judgment; (2) breach of contract; (3) waiver and estoppel; (4) bad faith; and (5) reformation.  *Id*. ¶¶ 64-95.  Zurich moves for summary judgment on all of First Solar's claims.  Docs. 88; 88-1.  First Solar moves for partial summary judgment establishing "that the applicable deductible is $100,000."  Docs. 90; 90-1 at 1.

### D.  Relevant Policy Provisions

"The policy contains an endorsement titled 'Construction Project General Conditions' which modifies the terms and conditions of the policy."  Docs. 88-2 ¶ 16; 90-4 at 60-64; 100-1 ¶ 17.  Section 26 of the endorsement states:

> No suit or action on this Policy for the recovery of any claim will be sustainable in any court of law or equity unless the Insured will have fully complied with all the requirements of this Policy.  Any action or proceeding against the Company for recovery of any loss under this Policy will not be barred if commenced within **(12) twelve** months after the **OCCURRENCE**\* becomes known to the Named Insured unless a longer period of time is required by applicable statute.

Doc. 90-4 at 64.

The policy "insures against all risks of direct physical loss of or damage to Covered Property while at the location of the INSURED PROJECT* and occurring during the Policy or Certificate Term."  *Id*. at 14.  "Insured project" is defined as

> Work which the Insured is contractually obligated to perform in accordance with the contract documents being more fully described and located as set forth in Project Certificates or quarterly reports issued hereunder.

*Id*. at 31.

"The policy provides certain coverage for loss or damage to physical property subject to a deductible that is applied on [a] per 'Occurrence' basis."  Docs. 88-2 ¶ 19; 90-4 at 14-26; 100-1 ¶ 19.  The policy defines "occurrence" as:

> With the exception of the perils of **EARTHQUAKE**\*, **FLOOD**\*, and **NAMED STORM**\*, **OCCURRENCE**\* includes all losses or damages that are attributable directly or indirectly to one cause or a series of causes and includes all resultant or concomitant losses wherever located.  All such losses or damages will be treated as one occurrence.
> …
> As respects the peril of **FLOOD**\*, **OCCURRENCE**\* shall mean all losses or damages arising during a continuous condition as defined in the definition of **FLOOD**\*

Doc. 90-4 at 31.  The policy defines "flood" as:

> A general and temporary condition of partial or complete inundation of normally dry land areas, including dewatered areas, from:
>
> (1) The rising, overflow, or expansion beyond normal boundaries of any body of water or watercourse, whether such body of water or watercourse is natural or man made;
>
> (2) The release or breaking of the boundaries of natural or man-made bodies of water or watercourses including the release or overflow of any water impounded by a dam, dike, reservoir or any other barrier or diversionary device;
>
> (3) Tsunami, waves, tide or tidal waters, and storm surge;
>
> (4) The unusual and rapid accumulation or runoff of surface waters from any source;
>
> (5) Mudslides or mudflows where mudslide or mudflows means a river of liquid and flowing mud on the surfaces of normally dry land areas, as when earth is carried by a current of water and deposited along the path of the current;
>
> or the spray from any of the foregoing, whether driven by wind or not.

*Id*. at 30-31.  The policy defines "water damage" as:

All damage caused by water, whatever the source, whether or not driven by wind, other than that otherwise defined as **FLOOD**\* or that resulting from a **NAMED STORM**\*.

*Id*. at 33.  In other words, any damage caused by water that does not fall within the

definition of "flood" is "water damage."

## II.  STANDARD[5, 6]

A court must grant summary judgment "if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is not genuine unless, based on

---

[5] Georgia law applies to all of First Solar's claims.  "A federal court sitting in diversity will apply the conflict-of-laws rules of the forum state."  *Grupo Televisa, S.A. v. Telemundo Commc'ns Grp., Inc.*, 485 F.3d 1233, 1240 (11th Cir. 2007) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). Georgia courts apply "the traditional rule of *lex loci contractus*" meaning contracts "are to be governed as to their nature, validity, and interpretation by the law of the place where they were made, except where it appears from the contract itself that it is to be performed in a State other than that in which it was made, in which case the laws of that sister State will be applied."  *Convergys Corp. v. Keener*, 276 Ga. 808, 811 & 811 n.1, 582 S.E.2d 84, 86 & 86 n.1 (2003) (quoting *Gen. Tel. Co. of Se. v. Trimm*, 252 Ga. 95, 95, 311 S.E.2d 460, 461 (1984)).  An insurance contract "is made, not where the policy is executed, but where the policy is in fact delivered."  *Pink v. A. A. A. Highway Express*, 191 Ga. 502, 13 S.E.2d 337, 337, *aff'd.*, 314 U.S. 201 (1941); *see also Gen. Tel. Co. of Se. v. Trimm*, 706 F.2d 1117, 1120 (11th Cir. 1983), *certified question answered*, 252 Ga. 95, 311 S.E.2d 460 (1984).  While the policy was delivered in Arizona, the policy certificate clarifies that the Twiggs Project—where the contract would be performed—is in Georgia. Docs. 1-3 at 2; 90-4 at 8.  Thus, Georgia law applies to the policy.

First Solar, without citing any authority, contends that the principle of *lex loci contractus* "does" or "should not" apply because it is "archaic."  Doc. 100 at 25 n.13.  This argument is meritless—the Georgia Supreme Court has repeatedly and recently affirmed its "commitment to the traditional choice of law rules," including *lex loci contractus*.  *Convergys*, 276 Ga. at 811, 582 S.E.2d at 86; *Coon v. Med. Ctr., Inc.*, 300 Ga. 722, 733 & 733 n.7 797 S.E.2d 828, 836 & 836 n.7 (2017) (rejecting the plaintiff's argument that Georgia's choice of law rules were "archaic").

[6] Under Georgia law, the insured has the burden to prove that it suffered a loss covered by the policy, that it complied with the conditions precedent under the policy, and that the insurer waived its right to raise a certain defense.  *Rsrv. Life Ins. Co. v. Davis*, 224 Ga. 665, 667, 164 S.E.2d 132, 133 (1968); *Wolverine Ins. Co. v. Sorrough*, 122 Ga. App. 556, 560-61, 177 S.E.2d 819, 822 (1970); *Metropolitan Life Ins. Co. v. Smith*, 48 Ga. App. 245, 247, 172 S.E. 654, 656 (1934); *see also* 17A Steven Plitt et. al., COUCH ON INSURANCE § 254:11 (3d ed. 2022).  However, the insurer bears the burden to prove a policy exclusion, exception, or other affirmative defense.  *Rsrv. Life Ins. Co. v. Ayers*, 217 Ga. 206, 213, 121 S.E.2d 649, 654 (1961); *see also* 17A Steven Plitt et. al., *Couch on Insurance* § 254:12 (3d ed. 2022).  Thus, First Solar has the burden to prove that it complied with the suit limitation provision, that Zurich waived its deductible position, that there was a mutual mistake justifying reformation, and that Zurich acted in bad faith; Zurich has the burden to prove that the flood deductible applies.

the evidence presented, "a reasonable jury could return a verdict for the nonmoving party." *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The burden rests with the moving party to prove that no genuine issue of material fact exists.  *Info. Sys. & Networks Corp.*, 281 F.3d at 1224.  The party may support its assertion that a fact is undisputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).

"If the moving party bears the burden of proof at trial, the moving party must establish all essential elements of the claim or defense in order to obtain summary judgment." *Anthony v. Anthony*, 642 F. Supp. 2d 1366, 1371 (S.D. Fla. 2009) (citing *Four Parcels of Real Prop.*, 941 F.2d at 1438).  The moving party must carry its burden by presenting "credible evidence" affirmatively showing that, "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the nonmoving party." *Four Parcels of Real Prop.*, 941 F.2d at 1438.  In other words, the moving party's evidence must be so credible that, if not controverted at trial, the party would be entitled to a directed verdict.  *Id.*

"If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the nonmoving party, in response, 'come[s] forward with significant, probative evidence demonstrating the existence of a triable issue of fact.'" *Id.* (quoting *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991))

(alteration in original).  However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  *Anderson*, 477 U.S. at 255.  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.*  Thus, the Court "can only grant summary judgment if everything in the record demonstrates that no genuine issue of material fact exists."  *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012) (quoting *Tippens v. Celotex Corp.*, 805 F.2d 949, 952 (11th Cir. 1986)).

In contrast, "[w]hen the *nonmoving* party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material *negating* the opponent's claim.'"  *Four Parcels of Real Prop.*, 941 F.2d at 1437 (quoting *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986)).  The moving party "simply may show ...  that there is an absence of evidence to support the nonmoving party's case."  *Id.* at 1438 (cleaned up).  "Assuming the moving party has met its burden, the non-movant must then show a genuine dispute regarding any issue for which it will bear the burden of proof at trial."  *Info. Sys. & Networks Corp.*, 281 F.3d at 1224-25 (citing *Cartrett.*, 477 U.S. at 324).

The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion.  *See Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005).  "Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed."  *United States v. Oakley*, 744 F.2d 1553, 1555 (11th

Cir. 1984) (internal quotation marks and citation omitted).  The Court will consider each motion on its own merits, and will view the facts "in the light most favorable to the non-moving party on each motion."  *Am. Bankers Ins. Grp.*, 408 F.3d at 1331; *Chavez v. Mercantil Commercebank, N.A.*, 701 F.3d 896, 899 (11th Cir. 2012).

## III.  DISCUSSION

"Insurance is a matter of contract and the parties are bound by the terms of the policy."  *Richmond v. Ga. Farm Bureau Mut. Ins. Co.*, 140 Ga. App. 215, 221, 231 S.E.2d 245, 249-50 (1976).  Under Georgia law, the interpretation of an insurance policy is generally "a question of law," to which courts apply the "ordinary rules of contract construction."  O.C.G.A. § 13-2-1; *Boardman Petrol., Inc. v. Federated Mut. Ins. Co.*, 269 Ga. 326, 327, 498 S.E.2d 492, 494 (1998).  "The cardinal rule of construction is to ascertain the intention of the parties.  If that intention is clear and it contravenes no rule of law and sufficient words are used to arrive at the intention, it shall be enforced irrespective of all technical or arbitrary rules of construction."  O.C.G.A. § 13-2-3.

"Under the rules of contract construction, the policy is construed against the insurer as the drafter of the policy and any exclusions from coverage are strictly construed."  *Pilz v. Monticello Ins. Co.*, 267 Ga. App. 370, 371-72, 599 S.E.2d 220, 221 (2004) (alterations omitted).  "[I]f the policy exclusions are unambiguous[,] they must be given effect 'even if beneficial to the insurer and detrimental to the insured.'"  *Id.* at 372, 599 S.E.2d at 221-22 (quoting *Jefferson Ins. Co. of N.Y. v. Dunn*, 269 Ga. 213, 215, 496 S.E.2d 696, 699 (1998)).  "[A] word or phrase is ambiguous when it is of uncertain meaning and may be fairly understood in more ways than one."  *N. Metro Directories Publ'g, LLC v. Cotton States Mut. Ins. Co.*, 279 Ga. App. 492, 494, 631 S.E.2d 726, 729

(2006) (quoting *Federated Mut. Ins. Co. v. Ownbey Enters., Inc.*, 278 Ga. App. 1, 5, 627 S.E.2d 917, 921 (2006)).

Zurich argues that it is entitled to summary judgment for four reasons.  Doc. 88-1. First, because First Solar filed suit more than twelve months after the last rain event, Zurich contends that the policy's twelve-month suit limitation clause bars all of First Solar's claims.  *Id*. at 2.  Second, Zurich argues it is entitled to summary judgment on First Solar's declaratory judgment, breach of contract, and waiver and estoppel claims "because First Solar's potentially covered losses do not exceed the applicable deductible, and application of the proper deductible is not a waivable coverage defense."  *Id*.  Third, Zurich asserts that First Solar's reformation claim fails because there is no evidence of mutual mistake regarding the appropriate deductible.  *Id*. at 2-3. Finally, Zurich argues that summary judgment is appropriate on First Solar's bad faith claim because First Solar failed to comply with the 60-day pre-suit notice requirement and its "coverage positions were reasonable."  *Id*. at 2.

First Solar argues it is entitled to summary judgment establishing "that the applicable deductible is $100,000" because (1) the plain language of the policy requires a $100,000 flood deductible for "insured projects" built in Flood Level 3; (2) the definition of "flood" is ambiguous and Zurich "has no admissible evidence showing [First Solar's] damage was caused by 'flood'"; and (3) Zurich waived the "right to change its deductible position" after making unconditional advance payments.  Doc. 90-1 at 1-2.

The Court concludes that there are genuine issues of material fact as to whether Zurich waived the suit limitation clause.  Thus, summary judgment on this ground is improper.  Regarding the applicable deductible, the Court concludes that: the policy's

definition of "flood" is unambiguous; the undisputed facts establish that First Solar's losses resulted from "occurrences" of "flood"; and the flood deductible is $2,500,000. However, the deductible is a waivable condition to payment and the undisputed facts demonstrate that Zurich waived its deductible position as a matter of law. Finally, summary judgment is proper on First Solar's bad faith claim because it did not comply with the pre-suit notice requirement and Zurich had reasonable grounds to contest the claim.

## A. Suit Limitation Clause

First Solar filed suit on November 12, 2021, more than twelve months after the last rain event on April 18, 2020. Docs. 1; 88-2 ¶ 31; 100-1 ¶ 31. Zurich argues that First Solar's claims are barred by the policy's twelve-month "suit limitation clause." Docs. 88-1 at 16-21; 90-4 at 64. First Solar contends that Zurich waived the suit limitation clause "because Zurich led First Solar to believe that Zurich would pay or settle its claim." Doc. 100 at 9-14. At the outset of this litigation, Zurich moved for dismissal based on the suit limitation clause; the Court ruled that First Solar had sufficiently alleged facts supporting waiver. Doc. 20. First Solar has now proffered admissible evidence to support those allegations. In short, issues of fact remain regarding whether Zurich waived the suit limitation clause and summary judgment on this ground is improper.[7] *See* Doc. 100 at 10-12.

---

[7] First Solar also argues that the "suit against the company" clause is a "time-expansion" provision rather than a suit limitation provision. Doc. 100 at 3-9. Because First Solar did not to move for summary judgment on this issue and because the Court concludes that issues of fact remain regarding whether Zurich waived the right to enforce the clause, it is not necessary to address First Solar's argument. However, the Court notes that the clause is oddly drafted: "Any action or proceeding against the Company for recovery of any loss under this Policy *will not be barred* if commenced within **(12) twelve** months after the **OCCURRENCE***becomes known to the Named Insured unless a longer period of time is required by applicable statute." Doc. 90-4 at 64 (italics added). Zurich offers no explanation for this wording. One court concluded that such a "suit against the company" clause could not "reasonably be

"[A]n insured's compliance" with a suit limitation provision "is a condition precedent to filing a lawsuit based on the policy." *Willis v. Allstate Ins. Co.*, 334 Ga. App. 540, 543, 779 S.E.2d 744, 746 (2015). But "where the application of a contractual limitation would work a forfeiture of the policy benefit, 'the court will strictly construe the provision against the insurance company and small circumstances will be sufficient to show a waiver by the company." *Gilbert v. Southern Trust Ins. Co.*, 252 Ga. App. 109, 111, 555 S.E.2d 69, 72 (2001). The actions of an insurer can create a disputed question of fact as to whether the insurer "lulled the insured into a belief" that the limitation was waived. *Edwards v. Atlantic Ins. Co.*, 203 Ga. App. 608, 610, 417 S.E.2d 410, 413 (1992). However, "[m]ere negotiation for settlement, unsuccessfully accomplished, is not [the] type of conduct … to constitute a waiver of the limitation defense." *Stone Mountain Collision Ctr. v. Gen. Cas. Co. Of Wi.*, 307 Ga. App. 394, 396, 705 S.E.2d 163, 165 (2010). "Rather, '[t]o conclude that the policy limitations have been waived or estopped, there must be an affirmative promise or other act waiving the limitation[,] or an actual or constructive fraud leading the insured to believe the limitation [period] would be enlarged." *Stapleton v. Gen. Acc. Ins. Co.*, 236 Ga. App. 835, 837, 512 S.E.2d 645, 647-48 (1999) (quoting *Bowers v. Safeco Ins. Co. of America*, 187 Ga. App. 229, 230, 369 S.E.2d 547, 548) (1988)).

In cases where Georgia courts have found waiver, "[e]ach involved investigations, negotiations, or assurances by the insurance company up to and past

---

construed as a contractual limitations provision" and "instead" operated "as a sort of 'discovery rule' for the insured's benefit." *Nw. Steel Erection Co. v. Zurich Am. Ins. Co.*, 2008 WL 187687, at *4 (D. Neb. Jan. 18, 2008). Another court held that a "suit against the company" clause was unambiguous and required an insured to file suit against its insurer within 12-months of discovering a loss. *Oakland-Macomb Interceptor Drain Drainage Dist. v. Zurich Am. Ins. Co.*, 2013 WL 5638755, at *3 (E.D. Mich. Oct. 15, 2013).

the period of limitation which would have led the insured to believe the limitation would not apply." *Mod. Carpet Indus., Inc. v. Factory Ins. Ass'n*, 125 Ga. App. 150, 151, 186 S.E.2d 586, 587 (1971). It "is not necessary that there be an actual promise to pay in order for the acts of the insurer to effect a waiver of the time limitation." *Nee v. State Farm Fire & Cas. Co*., 142 Ga. App. 744, 746, 236 S.E.2d 880, 882 (1977).

Here, a jury could find that Zurich's unconditional initial payments and negotiations led First Solar to believe that a settlement would be reached without the need for a lawsuit. From February 2020 until July 2020, Klaben had "several" conversations with Shaw stating that Zurich would be treating First Solar's claims as "water damage" and that the $100,000 water damage deductible would apply. Docs. 86-1 at 201; 90-22 at 50:24-51:24, 52:25-53:3; 90-28 at 3. Consistent with this representation, Zurich issued three advance payments, totaling $600,000. Docs. 86-1 at 196; 90-2 ¶ 29; 102-1 ¶ 29. Thus, Zurich did not simply "promise to pay" but affirmatively stated that the water damage deductible would apply and then issued advance payments consistent with that representation. *See Nee*, 142 Ga. App. at 746, 236 S.E.2d at 882.

Although Klaben sent First Solar a letter months later, on August 4, 2020, raising the *possibility* that the flood deductible applied, Klaben qualified that the claims were "still pending" and from October 2020 to February 2021, Zurich continued to adjust First Solar's claims. Docs. 90-2 ¶ 41; 90-30 at 3; 102-1 ¶ 41. When Shaw followed up with Klaben on the status of First Solar's claims in March 2021—more than a year after four of the five rain events—Klaben responded, "[s]till working on it." Doc. 90-33 at 2. In short, Zurich's initial payment and continued representations of investigation beyond the

suit limitation period would allow a reasonable jury to find that Zurich waived the suit limitation clause. *Edwards*, 203 Ga. App. at 610, 417 S.E.2d at 413 (holding that there may be waiver "[i]f the insurer never denied liability, but continually discussed the loss with its insured with a view toward negotiation and settlement without the intervention of a suit").

Nevertheless, Zurich contends that the August 4, 2020 letter unequivocally informed First Solar that "Zurich was reserving 'all of its rights under the Policy'" and that "Zurich's position was that the five rain events were subject to a $2,500,000 'flood' deductible." Doc. 112 at 5 n.8. Contrary to Zurich's assertion, the August 4, 2020 letter did not unambiguously state which deductible applied to First Solar's claims. Doc. 88-1 at 20. Rather, it simply brought "the policy definition of a flood loss" to First Solar's "attention." Doc. 90-30 at 2. The confusion over which deductible applied was compounded by Zurich's subsequent conduct—specifically Zurich's decision to continue adjusting First Solar's claims and verifying its losses. Docs. 90-2 ¶ 41; 102-1 ¶ 41. If Zurich's position was that the $2,500,000 deductible applied, there arguably would be no further need for Zurich to adjust the claims. Following the August 4, 2020 letter, First Solar had reason to believe it was "still possible" that Zurich would apply a $100,000 deductible. Doc. 90-22 at 163:12-15. As Shaw testified:

> We continued to work on the adjustment of [the claims]. And several of
> them appeared to not be in a situation where they would exceed the flood
> deductible…. So if Zurich was going to apply that, it would have begged
> the question, why, if the claims are obviously below the application of a
> deductible.

*Id*. at 163:18-24.[8]  This is not the case where the insured was "well aware" that the insurer "did not intend to fully pay the amounts it claimed to be due" before the expiration of the limitation period.  *Premier Eye Care Assocs., P.C. v. Mag Mut. Ins. Co.*, 355 Ga. App. 620, 626, 844 S.E.2d 282, 288 (2020).  Rather, Zurich did not issue an "ultimate determination" as to which deductible applied until March 22, 2021—more than a year after four of the five rain events.  Docs. 102-1 ¶ 85; 115 ¶ 85.  And even after Zurich sent its March 22 determination letter, it continued to try to resolve the dispute without the need for filing suit.  *See* Docs. 100-5 at 2 (assuring First Solar on June 23, 2021, that if the parties could not come to an agreement they would be "free to pursue judicial resolution of the dispute"); 100-6 at 2 (then qualifying that assurance on July 8, 2021: "With regard to your prior question about tolling, we agree that any claim(s) that were not time barred as of May 10, 2021, the date First Solar requested ADR, are tolled pursuant to the ADR provision G.").  As a result, the present case is distinguishable from the cases Zurich cites where an insurer repeatedly and unambiguously reserves its rights during a pending investigation.  *See, e.g., Shelter Am. Corp. v. Ga. Farm Bureau Mut. Ins. Co.*, 209 Ga. App. 258, 259, 433 S.E.2d 140, 142 (1993) (noting insurer "explicitly stated on three occasions that no contractual provisions were waived"); *Willis*, 334 Ga. App. at 544, 779 S.E.2d at 747 (noting insurer "never agreed that the losses were covered under the policy, never made any payments for the losses, and continuously warned [the insured] that it was not waiving any policy provisions").

---

[8] Zurich contends that First Solar was aware Zurich would apply the flood deductible to its claims well "before the suit limitation period" expired because First Solar's risk manager testified that the August 4 letter "indicate[d]" that "the flood deductible applied."  Docs. 88-1 at 20; 90-9 at 107:17-21.  But this interpretation of the August 4 letter conflicts with Shaw's testimony, merely illustrating that there are issues of fact regarding whether Zurich waived the suit limitation provision.

In sum, Zurich's initial payment and continued representations of investigation up to and past the suit limitation period are affirmative actions from which a jury could find that Zurich waived the right to enforce the suit limitation clause. Accordingly, Zurich's motion for summary judgment based on the suit limitation clause is **DENIED**.

## B. Applicable Deductible

Zurich contends that it did not breach the policy because "the potentially covered amounts of First Solar's five rain event claims do not exceed the applicable 'flood' deductible." Doc. 88-1 at 21-31. Specifically, Zurich argues that First Solar's losses resulted from five separate "occurrences" of "flood" as the terms are unambiguously defined in the policy. *Id*. And because First Solar's losses for the five rain events do not exceed the $2,500,000 flood deductible, Zurich does not owe any additional amounts under the policy. *Id*. In response, First Solar argues that its losses resulted from a single "occurrence" of "water damage." Doc. 90-1 at 20-28. Thus, the policy's $100,000 water damage deductible should apply to First Solar's claims. *Id*. But even if First Solar's losses resulted from "flood," First Solar argues that (1) the flood deductible is or should be reformed to be $100,000 and (2) that Zurich waived its right to assert a $2,500,000 per occurrence deductible. *Id*. at 18-20, 29-33.

The Court agrees that First Solar's claims resulted from five separate occurrences of "flood" and that the policy provides for a "flood" deductible of $2,500,000. However, the deductible is a waivable condition to payment and the undisputed facts demonstrate that Zurich waived its deductible position as a matter of law.

*1.  First Solar's losses resulted from five occurrences of flood.*

Zurich bears the burden of proving that the flood deductible applies.  *Canal Ins. Co. v. Bryant*, 173 Ga. App. 173, 325 S.E.2d 839 (1984) (holding that the insurer had the burden to prove which of two alternatives in a "limit of liability" provision yielded the lower loss); *State Auto Prop. & Cas. Co. v. Matty*, 2010 WL 3810816, at *2 (M.D. Ga. Sept. 23, 2010) (discussing *Canal Insurance Company*).  While it is the insured's burden to prove that it suffered a loss covered by the policy, there is no dispute that "'flood' and 'water damage' are covered causes of loss under the policy."  Docs. 90-2 ¶ 27; 102-1 ¶ 27; *Davis*, 224 Ga. at 667, 164 S.E.2d at 133.  Rather, the dispute is to what extent Zurich can "limit and deduct from its established payment obligation on a covered loss by showing damage was caused by flood."  Doc. 111 at 8.  Thus, Zurich bears the burden of establishing that the flood definition is unambiguous and applies to First Solar's claims.  *See Canal Ins. Co.*, 173 Ga. App. at 173-74, 325 S.E.2d at 841; *Hirschfield v. Cont'l Cas. Co.*, 199 Ga. App. 654, 655, 405 S.E.2d 737, 739 (1991).

a.  The definition of "flood" is clear and unambiguous.

The policy defines "flood" as "[a] general and temporary condition of partial or complete inundation of normally dry land areas, including dewatered areas, from … [t]he unusual and rapid accumulation or runoff of surface waters from any source."  Doc. 90-4 at 30-31.

"When determining the meaning of the words used in a contract, the words will 'generally bear their usual and common meaning and the usual and common meaning of a word may be supplied by common dictionaries.'"  *In re Est. of Boyd*, 340 Ga. App. 744, 747, 798 S.E.2d 330, 333 (2017) (quoting *Glob. Ship Sys., LLC v. Cont'l Cas. Co.*,

292 Ga. App. 214, 216, 663 S.E.2d 826, 829 (2008)); O.C.G.A. § 13-2-2(2).  The Oxford English Dictionary defines "general" as "including, participated in by, involving, or affecting, all, or nearly all, the parts of a specified whole, or the persons or things to which there is an implied reference"; "temporary" as "lasting for a limited time"; "inundation" as "the collection or accumulation of moisture"; "unusual" as "uncommon"; "rapid" as "quick, swift, fast"; and "surface water" as "water that collects on the surface of the ground."[9]

Applying the usual and common meaning of the undefined terms, the policy defines a "flood" as the widespread overflow of water onto normally dry land that lasts for a limited time.  Furthermore, the policy clearly states that the "flood" must result from the uncommon and fast collection of water on the surface of the ground *from any source*, which would include rain.  Doc. 90-4 at 30-31; *see also Hirschfield v. Cont'l Cas. Co.*, 199 Ga. App. 654, 655, 405 S.E.2d 737, 738 (1991) ("Surface water is water which is derived from falling rain or melting snow … and is diffused over the surface of the ground.") (quoting *Aetna Ins. Co. v. Walker*, 98 Ga. App. 456, 459, 105 S.E.2d 917, 920 (1958)).  Thus, the definition of "flood" is unambiguous.

---

[9] *General*, Oxford English Online Dictionary, https://www.oed.com/dictionary/general_adj?tab=meaning_and_use#3048002 (last visited May 2, 2024); *Temporary*, Oxford English Online Dictionary https://www.oed.com/dictionary/temporary_adj?tab=meaning_and_use#18884138 (last visited May 2, 2024); *Inundation*, Oxford English Online Dictionary, https://www.oed.com/dictionary/inudation_n?tab=meaning_and_use#170736 (last visited May 2, 2024); *Unusual*, Oxford English Online Dictionary, https://www.oed.com/dictionary/unusual_adj?tab=meaning_and_use#16324138 (last visited May 2, 2024); *Rapid*, Oxford English Online Dictionary, https://www.oed.com/dictionary/rapid_adj?tab=meaning_and_use#26665542 (last visited May 2, 2024); *Surface Water*, Oxford English Online Dictionary, https://www.oed.com/dictionary/surface-water_n?tab=meaning_and_use#19768703100 (last visited May 2, 2024).

First Solar argues that the policy definition is ambiguous and, as a result, must be construed against Zurich for four reasons.  Docs. 82-1 at 20-29; 90-1 at 20-29.  First, First Solar argues that the omission of "rain" from the definition of flood, but its inclusion in other portions of the policy, such as the definition of "named storm," means that "surface water" cannot include water originating from rain.[10]  Docs. 82-1 at 21-22; 90-1 at 21-22.  While 'the express mention of one thing" may imply "the exclusion of another," First Solar's argument ignores that the plain meaning of the phrase "surface water *from any source*" encompasses rain.  Docs. 90-1 at 21; 90-4 at 30 (emphasis added).  Thus, there was no need to include "rain" in the definition of flood because "any source" clearly and unambiguously includes rain.  Doc. 90-4 at 30.  First Solar contends that adopting this interpretation "makes no sense" because the definition would read "[t]he unusual and rapid accumulation or runoff of [rain] from [rain]."  Doc. 90-1 at 24 (quoting Doc. 90-4 at 30).  But that is not the definition that Zurich proposes.  *See* Doc. 102 at 15 nn.14-15.  Rather, the definition would be: "[t]he unusual and rapid accumulation or runoff of [water on the surface of the ground] from [rain]."  *See* Doc. 90-4 at 30.

Second, First Solar, citing a treatise and a Louisiana district court case, argues that the common understanding of "flood" is an inundation resulting from the "overflow of some body of water," which does not include rain.  Docs. 82-1 at 23; 90-1 at 23.  But the Court is "not authorized to substitute this or any other definition of the term ['flood'] for the one in the insurance policy when the policy plainly and unambiguously defined the term."  *Sorema N. Am. Reinsurance Co. v. Johnson*, 258 Ga. App. 304, 306, 574

---

[10] The policy defines "named storm" as "wind, wind gusts, hail, rain, tornadoes, or cyclones caused by or resulting from a specific storm system that has been named by the National Hurricane Center (NHC) or the Central Pacific Hurricane Center (CPHC) or any comparable worldwide equivalent[.]"  Doc. 90-4 at 31.

S.E.2d 377, 379 (2002).  And contrary to First Solar's assertion, the policy definition does not limit the enumerated causes of flood solely to the overflow of water that has already accumulated.  Docs. 82-1 at 23; 90-1 at 23.  The fifth enumerated cause states that "flood" can result from "[m]udslides or mudflows where mudslide or mudflows means a river of liquid and flowing mud on the surfaces of normally dry land areas, as when earth is carried by a current of water and deposited along the path of the current." Doc. 90-4 at 31.  Mudslides are caused by melting snow or heavy rainfall.  Thus, the fifth enumerated cause is not limited to the overflow of water that has already accumulated.

Third, First Solar attempts to find ambiguity in undefined terms in the flood definition, such as the words "unusual," "rapid," "general," and "temporary."  Docs. 82-1 at 25; 90-1 at 25.  But these terms can easily be defined by referencing "their usual and common meaning and the usual and common meaning … may be supplied by common dictionaries."  *In re* Est. of Boyd, 340 Ga. App. at 747, 798 S.E.2d at 333 (quoting *Glob. Ship Sys., LLC*, 292 Ga. App. at 216, 663 S.E.2d at 829); O.C.G.A. § 13-2-2(2).  The Court's previous analysis of the usual and common meaning of the allegedly "vague" terms illustrates that they are in fact unambiguous.  Notably, First Solar does *not* provide a reasonable alternative interpretation of these terms *or* the definition of "flood." As Zurich notes, First Solar "just summarily labels them 'vague.'"  Doc. 102 at 13.  This is insufficient to demonstrate ambiguity.

Finally, First Solar refers to extrinsic evidence, such as the 2015 version of the MBR form,[11] the EML report, and marketing materials, to support its contention that the

---

[11] First Solar's policy is based on the 2007 MBR form.  Docs. 90-2 ¶ 4; 102-1 ¶ 4.

"flood" definition is ambiguous.[12]  Doc. 82-1 at 21-24; 90-1 at 21-24.  While parol evidence can explain an ambiguity, it cannot create one.  *Perrett v. Dollard*, 176 Ga. App. 829, 830, 338 S.E.2d 56, 57 (1985) ("Although parol evidence is admissible to explain ambiguous language in a contract, it is not admissible to create an ambiguity where none exists."); *Michna v. Blue Cross & Blue Shield of Ga., Inc.*, 288 Ga. App. 112, 114, 653 S.E.2d 377, 379 (2007) ("[L]anguage which is unambiguous will not be construed as ambiguous based on extrinsic circumstances.").  Thus, this argument is unavailing.

First Solar's failure to provide a reasonable alternative interpretation of the flood definition is telling—a reasonable alternative interpretation does not exist.  The policy's definition of "flood" is unambiguous.  Accordingly, First Solar's motion for summary based on the alleged ambiguity of the "flood" definition is **DENIED** and Zurich's motion for summary judgment on this issue is **GRANTED**.

> b.  First Solar's losses resulted from five separate "occurrences" of "flood."

Zurich presents evidence that First Solar's losses resulted from five separate "occurrences" of "flood" and, thus, the "water damage" definition and associated deductible are inapplicable.

Beginning with the first portion of the "flood" definition, the policy defines a "flood" as the widespread overflow of water onto normally dry land that lasts for a limited time. Doc. 90-4 at 30 ("A general and temporary condition of partial or complete inundation of

---

[12] For example, First Solar argues that the "EML report makes clear that the risk of flood" the policy intended to cover was flood resulting from "Flat Creek" and "not rain."  Doc. 90-1 at 23.  But this argument misses the point.  While the EML report notes that Flat Creek posed a flood risk, the report does not narrow or limit the policy's unambiguous definition of flood "to claims involving the overflow of Flat Creek." Doc. 102 at 19 n.23.

normally dry land areas…").  It is undisputed that: the Twiggs Project sat on normally dry land (Docs. 102-1 ¶ 47; 115 ¶ 47); each rain event lasted, at most, a few days (Docs. 88-2 ¶¶ 33, 50; 100-1 ¶¶ 33, 50); rain caused water to accumulate on the ground, causing First Solar's losses (Docs. 88-2 ¶¶ 39-40; 100-1 ¶¶ 39-40); and First Solar was able to resume work in between the rain events by pumping out standing water (Docs. 88-2 ¶¶ 44, 47; 100-1 ¶¶ 44, 47).  Thus, it is undisputed that the rain events resulted in the widespread overflow of water onto normally dry land and that this condition lasted for a limited time.  *See, e.g.,* Docs. 88-26 at 5-9; 88-27 at 3-4; 88-28 at 4-13; 88-29 at 4-5; 90-20 at 109:22-25 ("Q: Do you agree that that shows the surface inundated with water? …. A: It's covered with water.").  The first part of the "flood" definition is met.

Turning to the second portion of the definition, the flood must result from the uncommon and fast collection of water on the surface of the ground from any source, including rain.  Doc. 90-4 at 30 ("The unusual and rapid accumulation or runoff of surface waters from any source[.]").  It is undisputed that the presence of standing water at the Twiggs Project was caused by heavy rain.  Docs. 88-2 ¶ 40; 90-2 ¶ 26; 100-1 ¶ 40; 102-1 ¶ 26.  The rain fell, accumulated on the ground, and either submerged or washed out portions of the solar field.  *See, e.g.,* Doc. 90-20 at 52:7-9 ("[T]he rainwater had – had washed away the – the dirt at the base of the post."), 102:13-18 ("Q: Do you recall in your drive around the property after the February the 13th, 2020 rain event that the modules in block two, array four were under water? … A: Yes, I believe so."), 138:9-13 ("Q: The pictures that you've seen today that showed damage from runoff or standing water, was all of that caused by rain? …. A: Yes, I would say.").  Thus, it is

undisputed that the widespread overflow of water was caused by the unusual and rapid

accumulation of water on the ground from rain.  *See, e.g.,* Docs. 88-26 at 5-9; 88-27 at

3-4; 88-28 at 4-13; 88-29 at 4-5.  The second part of the "flood" definition is met.

Still, First Solar contends that its losses resulted from "water damage" rather than

"flood."[13]  Doc. 100 at 17-18.  "Water damage" is defined as "[a]ll damage caused by

water, whatever the source, whether or not driven by wind, other than that otherwise

defined as FLOOD* or that resulting from a NAMED STORM*."  Doc. 90-4 at 33.  In

other words, any damage caused by water that does not fall within the definition of

"flood" is "water damage."  Because First Solar's losses fall within the unambiguous

definition of "flood," they cannot also fall within the definition of "water damage."[14]

Next, First Solar argues that Zurich "presents no evidence that any accumulation

or runoff was rapid" because Zurich's "civil engineering expert failed to perform

calculations of velocity or rate of water flow."  Doc. 101 at 18.  But it is undisputed that

---

[13] The Court notes that a key question was never answered: Why did Klaben conclude that First Solar's claims fell within "water damage" coverage and make unconditional payments based on that conclusion? Klaben was reversed, apparently by outside counsel.  *See* Doc. 90-34.  Zurich simply asserts that Klaben made a "mistake."  Doc. 51 at 79:6-7.  When First Solar tried to depose Klaben, Zurich maintained that he was unavailable because of a recent cancer diagnosis.  *Id*. at 31:11-13.  Then First Solar learned that, despite his medical condition, Klaben was vacationing in Europe.  *Id*. at 31:13-17.  As a result, First Solar subpoenaed Klaben for a deposition.  Doc. 48-2.  In response, Klaben moved for a protective order, requesting a deposition by written question only, because he was still receiving cancer treatment.  Doc. 48.  The Court convened a hearing to resolve the dispute.  Doc. 51.  First Solar, understandably, concluded that a deposition by written question was not a substitute for an oral deposition.  *Id*. at 34:9-12.  However, Zurich produced a declaration from Klaben's doctor stating that Klaben should not appear for a deposition.  Doc. 48-1.  Zurich represented that it still had no evidence why Klaben changed his mind—if in fact he did.  Doc. 51 at 78:10-17.  The Court concluded that "unless and until [Zurich] can come up with some evidence to the contrary," it was admitting *in judicio* "that it was Mr. Klaben who made the decision to change the classification of the claim from water damage to flood" and that Zurich had "no information about why he changed his mind."  *Id*. at 78:21-79:5.  Zurich has not produced any evidence explaining why Klaben changed his claims classification.

[14] Even if a portion of First Solar's losses resulted from "water damage," the flood deductible (absent waiver), as the largest of the two deductibles, would apply to each of First Solar's claims.  Doc. 90-4 at 25 (If "more than one deductible applies to insured physical loss or damage from a single OCCURRENCE*, only the largest of the applicable deductibles will be applied[.]").

each rain event lasted, at most, a few days.  Docs. 88-2 ¶¶ 31, 33, 50; 100-1 ¶¶ 31, 33, 50.  First Solar does not dispute this evidence by, for example, providing testimony that the rain accumulated over weeks or months, but rather argues that the term "rapid" essentially requires Zurich to proffer evidence of a "specific velocity of surface water." *See* Doc. 112 at 11.  That is not what the policy requires.  Rather, the Court applies the usual and common meaning of the undefined terms.  *In re* Est. of Boyd, 340 Ga. App. at 747, 798 S.E.2d at 333.  The usual and common meaning of "rapid" is "quick, swift, fast."[15]  It is beyond any reasonable dispute that is what happened here.  Docs. 88-2 ¶¶ 33, 50; 100-1 ¶¶ 33, 50.  Thus, Zurich has presented uncontroverted evidence that the accumulation of surface water was rapid.

Finally, First Solar argues that Zurich has no evidence that the rain events were "unusual" because two of Zurich's experts and First Solar's on-site electrical engineer testified that the rain events were not unusual.  Doc. 101 at 18-19.  But the relevant question, as Zurich points out, is not whether the *rain events* were unusual but whether the *accumulation* or *runoff* of rainwater on the surface of the ground was unusual.  Docs. 90-4 at 30 ("The unusual and rapid *accumulation* or *runoff* of surface waters …"); 102 at 23.  While these individuals testified that it was not unusual for Twiggs County to experience heavy rain, they did *not* testify that it was usual or common for rain to rapidly accumulate and flood or inundate the property on which the Twiggs Project sat.  On the

---

[15] *Rapid*, Oxford English Online Dictionary,
https://www.oed.com/dictionary/rapid_adj?tab=meaning_and_use#26665542 (last visited May 2, 2024).

contrary, it is undisputed that the Twiggs Project sat on normally dry land.[16]  Docs. 102-1 ¶ 47; 115 ¶ 47.

In sum, First Solar's losses clearly fall within the unambiguous definition of "flood" and no reasonable jury could find otherwise.  Accordingly, First Solar's motion for summary judgment based on Zurich's alleged failure to provide evidence that First Solar's losses were caused by "flood" is **DENIED** and Zurich's motion for summary judgment on this issue is **GRANTED**.

2. *The flood deductible, absent waiver, is $2,500,000.*

First Solar argues that "even if Zurich could show that any damage was caused by 'flood,'" the flood deductible "is or should be reformed to be $100,000."  Docs. 82-1 at 18-20; 90-1 at 18-20; 100 at 14-16.  Specifically, First Solar argues that because it built the solar field in Flood Level 3, which requires a $100,000 deductible, rather than Flood Level 1, which requires a 2% deductible with a maximum of $2,500,000, "the policy unambiguously requires a $100,000 deductible."  Docs. 82-1 at 18-19; 90-1 at 18-19; 100 at 14.  Furthermore, even if the plain language of the policy does not require a $100,000 deductible, First Solar argues the flood deductible should be reformed based on mutual mistake.  Docs. 82-1 at 19-20; 90-1 at 19-20; 100 at 15-16.  Both arguments fail.

---

[16] First Solar also argues that Zurich cannot satisfy its burden to demonstrate that First Solar's losses resulted from flood "because it made no claim determination."  Docs. 82-1 at 25-28; 90-1 at 25-28; 111 at 9-11.  While Zurich's claims determination, or lack thereof, is relevant to First Solar's contention that Zurich waived the deductible limit as a defense, it has no bearing on the Court's interpretation of the policy and application of the policy's plain language to the facts here.  *See Mullis v. Bibb Cnty.*, 294 Ga. App. 721, 723, 669 S.E.2d 716, 718 (2008) ("But neither an erroneous interpretation of contract language nor a later decision to revise that language creates ambiguity in contract language that is capable of only one reasonable interpretation.").

      a.  The plain language of the policy states that the flood deductible is $2,500,000.

Zurich's payment obligation on a covered loss is offset by the applicable deductible.  Specifically, the policy states that the "applicable deductible shown in the SCHEDULE OF RATES AND DEDUCTIBLES shall be deducted from the amount of each claim and the liability of the Company shall be only for the amount of such insured loss or damage in excess thereof, subject to the applicable Limit, Sublimits or Annual Aggregate Limits of Liability."  Doc. 90-4 at 24.  The "schedule of rates and deductibles" provides that risks within Flood Level 1 are subject to a 2% deductible with a minimum of $250,000 and a maximum of $2,500,000, while risks within Flood Level 3 are subject to a $100,000 deductible.  *Id*. at 36.  The "schedule of rates and deductibles" does not state what Flood Level and corresponding deductible applies to First Solar's policy—that information is provided in the project certificate.  "When an insured obtains insurance coverage through a master builders risk program, each project is underwritten on a project certificate basis and subject to the terms and conditions of the Master Builders Risk Policy instead of its own individual policy."[17]  Docs. 102-1 ¶ 92; 115 ¶ 92. Thus, the project certificate is a part of the policy and specifies which flood deductible applies.  *Cherokee Credit Life Ins. Co. v. Baker*, 119 Ga. App. 579, 583, 168 S.E.2d 171, 174 (1969) ("The policy and the certificate are interlocked like the Siamese twins. Contemporaneous instruments, each affecting and controlling the same subject-matter the two writings may be considered as essential, indivisible parts of one contract.").

---

[17] First Solar, citing no evidence, "disputes" that its policy was underwritten on a per-certificate basis. Doc. 115 ¶ 92.  "All material facts contained in the movant's statement which are not specifically controverted *by specific citation to particular parts of materials in the record* shall be deemed to have been admitted, unless otherwise inappropriate."  M.D. Ga. L.R. 56 (emphasis added).

The project certificate states that the flood deductible is 2% subject to a minimum of $250,000 and a maximum of $2,500,000.  Docs. 1-3 at 3; 102-1 ¶ 62; 115 ¶ 62. Because 2% of the total project value in place at the time of the first rain event exceeded $2,500,000, the flood deductible was subject to the $2,500,000 maximum. Docs. 88-1 at 29 n.19; 102-1 ¶ 100; 115 ¶ 100.  Thus, the plain language of the policy states that the flood deductible is $2,500,000—a contrary interpretation would render the project certificate meaningless.  *Albany v. Dougherty Cnty.*, 352 Ga. App. 664, 668, 835 S.E.2d 681, 685 (2019) ("Georgia law requires us to give meaning to every term of a contract rather than construe any term as meaningless, and to construe a contract so as to uphold the contract in whole and in every part.").

Hernandez, a Zurich underwriter, was responsible for determining the applicable flood zone and flood deductible.  *See* Docs. 102-1 ¶ 96; 115 ¶ 96.  He determined the flood zone by comparing a site map provided by First Solar to flood maps and other modeling.  Docs. 90-13 at 48:10-13, 55:5-16, 87:13-19, 89:2-7; 102-1 ¶ 53; 115 ¶ 53. Hernandez concluded that there were multiple flood zones present at the project site— Flood Zone A, a subset of Flood Level 1, and Flood Zone Unshaded X, a subset of Flood Level 3.  Doc. 90-13 at 47:23-3, 92:7-15, 201:15-23, 215:5-216:2; 102-1 ¶¶ 53-55; 115 ¶¶ 53-55.  Because a portion of the Twiggs Project site was located in Flood Zone A and because "materials and valuables can be anywhere within the site," Hernandez used Flood Level 1 to set the flood deductible.  Doc. 90-13 at 212:25-213:25; 102-1 ¶¶ 53-55; 115 ¶¶ 53-55.  As a result, Hernandez issued the project certificate with the corresponding Flood Level 1 deductible.

First Solar, citing the policy's definition of "insured project," argues that Hernadez "made a flood determination inconsistent with the policy."  Docs. 82-1 at 18-19; 90-1 at 18-19; 100 at 14; 111 at 2-4.  "Insured project" is defined as "[w]ork which the Insured is contractually obligated to perform in accordance with the contract documents being more fully described and located as set forth in Project Certificates[.]"  Doc. 90-4 at 31. Because the policy only insures "Covered Property while at the location of the INSURED PROJECT*" and because "insured project," according to First Solar, means the location of the solar arrays, First Solar contends that Hernadez should have set the flood zone based only on the location of the solar arrays.  Docs. 82-1 at 18-19; 90-1 at 18-19; 100 at 14; 111 at 2-4.

But even if the Court concluded "insured project" was ambiguous, "no jury question arises unless the ambiguity remains after the court has applied the statutory rules of construction in attempting to resolve the ambiguity."  *Hirschfield*, 199 Ga. App. at 655, 405 S.E.2d at 738.  "The cardinal rule of contract construction is to determine the intent of the parties.  It is the parties' intent at the time the contract is made that governs; if the language of a contract may be understood fairly in more than one way, it should be construed to reflect the sense in which the parties themselves understood it at the time of execution.  Extrinsic evidence is admissible to establish that understanding."  *Dooley v. Dun & Bradstreet Software Servs., Inc.*, 225 Ga. App. 63, 65, 483 S.E.2d 308, 310 (1997); *Patel v. Diplomat 1419VA Hotels, LLC*, 358 Ga. App. 732, 740-41, 856 S.E.2d 340, 347 (2021).  "When parties disagree as to their intent upon entering an agreement, the meaning placed upon the contract language by one party

and known to be thus understood by the other party at the time shall be held as the true meaning." *Dooley*, 225 Ga. App. at 65, 483 S.E.2d at 310; O.C.G.A. § 13-2-4.

It is undisputed that both parties understood that Zurich's flood zone determination was based on the "larger" project site, that the larger project site included Flood Zone A, and that properties in Flood Zone A carried a 2% deductible subject to the minimum $250,000 and maximum $2,500,000.

Before issuing the project certificate, Hernadez noted that based on the coordinates provided in the questionnaire the project appeared to be in Flood Level 1 but that he would need the "exact location and footprint of the project" to finalize the flood zone. Docs. 90-12 at 2; 90-13 at 55:5-16. Hernandez then used *a site map provided by First Solar* to determine the applicable flood zone. Doc. 90-13 at 55:5-16, 87:13-19, 89:2-7. After comparing the First Solar site map to flood maps and other modeling, Hernadez emailed Mestre, First Solar's insurance broker, stating that the Twiggs Project would be subject to the 2% deductible, subject to a minimum of $250,000 and maximum of $2,500,000. Docs. 90-14 at 2-3. Mestre responded and asked for confirmation on the flood zone: "I wasn't sure about the Flood Zone, so it is Zone A then?" *Id*. at 2. Hernandez responded, "That's correct. A significant amount of the project is located in the 100 year flood plain." *Id*. And when Mestre forwarded the project certificate to First Solar's risk manager, he "point[ed] out" that the flood deductible would be "2% subject to the minimum $250,000 and maximum $2.5M" because "Zurich confirmed the majority of the project is located in high hazard flood zone." Docs. 88-62 at 2. In short, it is undisputed that both parties intended for Flood Zone A to apply to the Twiggs Project.

Furthermore, the parties could not have intended to use the location of the solar arrays to set the flood zone because the location of the solar arrays was not known when Hernandez made the flood zone determination. As First Solar acknowledges, it was not until *after* the policy was issued and *after* Zurich drafted the EML report that First Solar made the decision to construct the solar arrays outside of Flood Zone A.[18] *See* Docs. 90-7 at 58:22-59:6; 90-14 at 5. Finally, the EML report confirmed that—based on the larger project site—both Flood Zones A and X were present. Doc. 90-16 at 9 ("[T]he project site is located in FEMA Flood Zone X, unshaded, with the eastern portions of the site adjacent to Flat Creek which is in FEMA Flood Zone A."). First Solar did not challenge Zurich's assessment that the project site included land in Flood Zone A or request that Zurich alter the flood deductible in light of its decision to build the solar arrays outside of Flood Zone A. *See* Docs. 102-1 ¶ 66; 115 ¶ 66. Thus, the evidence is undisputed—both parties understood that the insured project was the entire project site, not just the site of the solar arrays; that a portion of the site was in Flood Zone A; and that the flood deductible was 2% subject to the minimum $250,000 and maximum $2,500,000.[19] In sum, the flood deductible is $2,500,000.

---

[18] In fact, the contract between First Solar and Twiggs County Solar LLC states that Flood Zones A *and* X were present at the project site. Doc. 101-10 at 100 ("Existing Site and Environmental Conditions … Floodplains FEMA Zones A and X."), 102 ("For areas located in a flood zone, applicable arrays shall be designed so that all roads, inverter / PCS equipment and array and tracker electrical equipment are designed and installed pursuant to Applicable Law relating to flood water clearances and scouring.").

[19] First Solar contends that the testimony of Allison Coffee-Snyder, Zurich's 30(b)(6) representative on underwriting topics, supports it assertion that Zurich intended for the $100,000 deductible to apply to its claims. Docs. 82-1 at 18-19; 90-1 at 18-19. Coffee-Snyder testified:

> Q: I understand you don't agree that the project was in unshaded X. We'll see. But if it was, Zurich's intent was that it would be $100,000 instead of 2.5, correct?
> A: Yes, if it had been in a lower flood zone, it would have been – it would have been $100,000.

b.  There is no evidence of mutual mistake to support reformation of the "flood" deductible.

"Reformation of a contract is an equitable remedy for correcting an instrument to make it express the true intention of the parties, where from some cause, such as fraud, accident, or mistake, it does not express such intention." *Occidental Fire & Cas. of N.C. v. Goodman*, 339 Ga. App. 427, 428-29, 793 S.E.2d 606, 608 (2016).  "Where reformation is sought on the ground of mutual mistake, it must, of course, be proved to be the mistake of both parties." *CS-Lakeview at Gwinnett, Inc. v. Simon Prop. Grp., Inc.*, 283 Ga. 426, 427, 659 S.E.2d 359, 361 (2008) (quoting *A.J. Concrete Pumping, Inc. v. Richard O'Brien Equip. Sales, Inc.*, 256 Ga. 795, 795, 353 S.E.2d 496, 497 (1987)).  "The power to relieve mistakes shall be exercised with caution; to justify it, the evidence shall be clear, unequivocal, and decisive as to the mistake." *Id.* (quoting O.C.G.A. § 23-2-21).  "Thus, the burden on the party attempting to prove mutual mistake is a 'heavy' one." *First Chatham Bank v. Liberty Cap., LLC*, 325 Ga. App. 821, 827, 755 S.E.2d 219, 224 (2014) (quoting *Hall v. Hall*, 303 Ga. App. 434, 437, 693 S.E.2d 624, 626 (2010)).

First Solar argues that reformation is appropriate because the parties set the flood deductible on the mistaken premise that the "insured project" was "the entire site on which the construction occur[red]."  Doc. 100 at 15.  First Solar contends that the incorrect coordinates on the project certificate confirm this misunderstanding.  *Id.*

---

Doc. 83-2 at 171:20-23.  First Solar argues that Coffee-Snyder's answer should be interpreted as "if [the insured project] had been in a lower flood zone" the deductible would be $100,000.  Docs. 82-1 at 18; 90-1 at 18; 111 at 4.  This argument merely highlights that the parties disagree on how to define "insured project."  First Solar contends it means the location of the solar arrays.  Zurich contends it means the larger project site.  As the Court discussed, extrinsic evidence at the time of the contract execution confirms that the parties intended for "insured project" to mean the larger project site.

Specifically, the project certificate uses the pair of coordinates 32.59108, -83.445652 to identify "the location of insured project." Doc. 1-3. First Solar points out that these coordinates are incorrect because they indicate a point two miles away from the solar field. Doc. 100 at 15. While Zurich may have used the project coordinates to provide First Solar with preliminary pricing, the coordinates were not the basis for the final flood zone determination. Doc. 90-13 at 44:24-45:15, 55:5-16, 87:13-88:3. Rather, Hernandez testified that he made the final flood zone determination and associated deductible provided on the project certificate by comparing the site map to various flood maps and other modeling. *Id*. Thus, the incorrect coordinates on the project certificate are not evidence of a mutual mistake.

In short, the undisputed facts demonstrate that both parties knew the flood zone was set using the entire project site and that the flood deductible was 2% with a minimum of $250,000 and a maximum of $2,500,000. This understanding was repeatedly confirmed. *E.g.*, Docs. 88-62; 90-12; 90-14. There is no evidence of a mutual mistake and there is no basis for reforming the policy. Accordingly, First Solar's motion for summary judgment on its reformation claim is **DENIED** and Zurich's motion for summary judgment on First Solar's reformation claim is **GRANTED**.

### 3. Zurich waived the right to assert the $2,500,000 flood deductible as a condition to payment.

First Solar argues that even if its losses resulted from five separate occurrences of "flood" and even if the flood deductible is $2,500,000, Zurich waived the right to assert the deductible as a defense. Docs. 82-1 at 29-31; 90-1 at 29-31; 101 at 19-22; 111 at 5-7. The Court agrees—the deductible is a waivable condition to payment and Zurich waived the right to assert the flood deductible as a matter of law.

"It is well established that a party to a contract may waive a contractual provision for his or her benefit." *Forsyth Cnty. v. Waterscape Servs., LLC*, 303 Ga. App. 623, 630, 694 S.E.2d 102, 109 (2010).  However, "waiver or estoppel may not be used to enlarge the coverage contained in a policy of insurance." *Sargent v. Allstate Ins. Co.*, 165 Ga. App. 863, 865, 303 S.E.2d 43, 46 (1983).  Zurich's argument that the deductible is a nonwaivable defense turns on the distinction between "policy" and "coverage" defenses.  Docs. 88-1 at 27-28; 103 at 28-29; 113 at 11-12.  A coverage defense "is an assertion that the insurance policy does not cover the specific injury in question, and includes provisions like exclusions for damage from firearms or due to an insured's defective workmanship." *Century Cmtys. of Ga., LLC v. Selective Way Ins. Co.*, 2023 WL 2237303, at *3 (11th Cir. Feb. 27, 2023) (citing *Andrews v. Georgia Farm Bureau Mut. Ins. Co.*, 226 Ga. App. 316, 317, 487 S.E.2d 3, 4 (1997)).  Policy defenses, on the other hand, typically involve the "insured's failure to fulfill a procedural condition," such as "conditions as to other insurance, conditions requiring proof of loss, and conditions requiring timely written notice." *Id*. (citing *Sargent*, 165 Ga. App. at 865-66, 303 S.E.2d at 46).  "While policy defenses may be subject to waiver, coverage defenses are not." *Id*. (citing *AEGIS Elec. & Gas Int'l Servs. Ltd. v. ECI Mgmt. LLC*, 967 F.3d 1216, 1227 n.8 (11th Cir. 2020)).  Because a deductible is not a "procedural prerequisite," Zurich contends that the deductible must be a nonwaivable coverage defense.  Docs. 88-1 at 27-28; 102 at 28-29; 112 at 11-12.

While procedural prerequisites are policy defenses, not all policy defenses are procedural prerequisites.  *Sargent*, 165 Ga. App. at 865-66, 303 S.E.2d at 46 (collecting cases).  Policy defenses also include conditions of title or ownership, conditions of pre-

existing health, and conditions concerning the location of insured cars.  *Id*.  Therefore, the distinction between policy and coverage defenses is not whether the condition involves a "procedural" requirement.  *Id*.  Rather, the "critical question" is whether the insured "is seeking to employ the theory of implied waiver to cover a loss not within the coverage of the [] policy" and, thus, assert a nonwaivable coverage defense.  *Id*. at 866, 303 S.E.2d at 46.

For example, in *Sargent*, a nonresident family member of the insured was afforded liability coverage for a claim even though the insurer knew the family member did not live with the insured.  *Id*. at 863-64, 303 S.E.2d at 44-45.  Thereafter, the insurer sought to avoid coverage based on a requirement that a family member, to be covered, must reside in the insured's household.  *Id*. at 864-66, 303 S.E.2d at 45-56.  The court concluded that because the policy "cover[ed] bodily injury, sickness, disease or death to any person" and because the insured's claim was "for injury and death" to a third-party that "result[ed] from collision with the car [she] operated," the claim was "clearly a risk assumed by [the insurer] under the terms of the contract."  *Id*. at 866, 303 S.E.2d at 46. As a result, the insurer could waive the resident relative requirement because it was "a condition imposed" for its benefit and waiver would "in no way result[] in an expansion of the coverage so as to include a risk not assumed by the insurer."  *Id*.

Here, there is no dispute that First Solar's claims are covered.  Docs. 88-1 ("Under the subject policy's unambiguous language, First Solar's *covered loss* for each of its five rain claims resulted from a separate 'Occurrence' of 'Flood.'") (emphasis added); 90-2 ¶ 27; 102-1 ¶ 27.  In other words, First Solar's losses—whether categorized as "flood" or "water damage"—are "clearly [] risk[s] assumed by [Zurich]

under the terms of the contract." *Sargent*, 165 Ga. App. at 866, 303 S.E.2d at 46.  The deductible merely reduces Zurich's pre-existing payment obligation.  As a result, the decision to apply the flood deductible is a "condition imposed for the benefit of [Zurich], and is, therefore, subject to waiver."[20]  *Id*.

"While normally the question of waiver is a matter for the jury, where … the facts and circumstances essential to the waiver issue are clearly established[,] waiver becomes a question of law." *Waterscape Servs., LLC*, 303 Ga. App. at 630, 694 S.E.2d at 110 (quoting *Mauldin v. Weinstock*, 201 Ga. App. 514, 520, 411 S.E.2d 370, 374 (1991)).  "A waiver may be express, or may be inferred from actions, conduct, or a course of dealing." *Id*. at 630, 694 S.E.2d at 109 (quoting *Greater Georgia Life Ins. Co. v. Eason*, 292 Ga. App. 682, 687, 665 S.E.2d 725, 729 (2008)).  "However, all the attendant facts, taken together, must amount to an intentional relinquishment of a known right, in order that a waiver may exist." *Id*. at 630, 694 S.E.2d at 110 (quoting *Greater Ga. Life Ins. Co.*, 292 Ga. App. at 687, 665 S.E.2d at 729).  Once a condition is waived, it cannot be reclaimed. *Sargent*, 165 Ga. App. at 867, 303 S.E.2d at 47.

Here, the undisputed facts establish waiver as a matter of law.[21] *Sargent*, 165 Ga. App. at 867, 303 S.E.2d at 47 (holding the insured was entitled to judgment as a

---

[20] The cases Zurich cites for the proposition that a deductible is a nonwaivable coverage defense are distinguishable—none address whether a deductible is a policy or coverage defense.  Doc. 102 at 28 (citing *Mock v. Cent. Mut. Ins. Co.*, 158 F. Supp. 3d 1332, 1345-46 (S.D. Ga. 2016); *Langdale Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Penn.*, 110 F. Supp. 3d 1285 (N.D. Ga. 2014); *Danforth v. Gov't Emps. Ins. Co.*, 282 Ga. App. 421, 427, 638 S.E.2d 852, 858-59 (2006)).

The only case Zurich cites that addresses a deductible provision is *Alea London Limited. v. American Home Services, Inc*orporated, 638 F.3d 768 (11th Cir. 2011).  Doc. 113 at 12.  But *Alea London Limited* analyzed whether a deductible provision was ambiguous, not whether the application of the deductible was a waivable condition to payment.  638 F.3d at 774-75.

[21] Notably, Zurich does not argue that the undisputed facts are insufficient to find that it waived its deductible position.  Rather, Zurich relies solely on its contention that the deductible is a nonwaivable coverage defense.  *See* Docs. 88-1 at 27-28; 102 at 28-29; 112 at 11-12.

matter of law on the issue of waiver).  After visiting the Twiggs Project to inspect the damage from the first two rain events, Klaben repeatedly assured First Solar that its claims "were going to be viewed as water damage claims" with a $100,000 deductible.  Doc. 90-22 at 50:24-51:24, 52:25-53:3.  Klaben made multiple notations in First Solar's claims file consistent with his representation that First Solar's claims were water damage claims and would be subject to a $100,000 deductible.  Docs. 86-1 at 201; 86-2 at 4; *see also* Doc. 90-28 at 3.  And most importantly, Zurich issued, with no reservations or conditions, three advance payments to First Solar, which applied a $100,000 deductible.[22]  Docs. 86-1 at 196; 90-2 ¶¶ 29-30; 102-1 ¶¶ 29-30.  "[P]ayment by the insurer with knowledge of the pertinent circumstances giving it a policy defense waives its right to rely thereon."  *Sargent*, 165 Ga. App. at 866, 303 S.E.2d at 46 (quoting 16C Appleman, Insurance Law and Practice, 564, § 9366); *Travelers Prop. Cas. Ins. Co. v. Mouton*, ___ F. Supp. 3d. ____, 2023 WL 8351551, at *7 (N.D. Ga. Oct. 17, 2023).  Zurich did not request a non-waiver agreement from First Solar prior to paying the advances or issue a "reservation of rights" to clarify that the advance payments were subject to the right to later change its deductible position.[23]  It was only

---

[22] Zurich disputes that Klaben applied the $100,000 water damage deductible when he issued the advance payments because "[n]either the checks nor the claims notes address a deductible being applied to the three advance payments."  Doc. 102-1 ¶ 30.  But on June 10, 2020, when Klaben approved the three advance payments, he noted: "claimed damages per Insured = $577K *and so less $100K deductible* we noted/in agreement with insured for $200K advance request."  Doc. 86-1 at 196 (emphasis added).  Thus, while the checks do not state whether a $100,000 deductible applied, Klaben's claim notes immediately preceding the advance payments state that Zurich was issuing the advance payment request "less $100K deductible."  Docs. 1-4; 86-1 at 196; *see also* Doc. 90-21 at 161:11-16 ("Q: At that time, [Klaben] authorized those payments on behalf of Zurich based upon a conclusion that a $100,000 applied, right?  A: At that point, it looked like he was -- he was considering the $100,000 deductible in his advance payment.").

[23] The application of reservations of rights in the first-party context under Georgia law is unclear.  *Travelers Prop. Cas. Ins. Co.*, ___ F. Supp. 3d. ____, 2023 WL 8351551, at *6 (collecting cases).  "Some cases suggest that … a reservation of rights, is inappropriate in the first-party context."  *Id.*  "Other cases

*after* the advance payments were issued and *after* its repeated assurances that First Solar's losses would be categorized as water damage claims that Zurich changed its position on what deductible applied. *See* Docs. 90-30; 90-34. But once a condition has been waived, it cannot be reclaimed. *Sargent*, 165 Ga. App. at 867, 303 S.E.2d at 47. Thus, the Court finds that Zurich waived any right to assert a higher deductible applied. Accordingly, First Solar's motion for partial summary judgment on this issue is **GRANTED** and Zurich's motion for summary judgment on this issue is **DENIED**.

> *4. There are genuine issues of material fact as to whether First Solar's losses exceed the $100,000 deductible.*

First Solar contends that Zurich owes $10,146,341.29 under the policy. Docs. 88-1 at 29; 90-25 at 2; 112 at 12-13. The chart below summarizes First Solar's claimed losses:

| Rain Event | Change Orders | General Conditions | Claim Preparation | Total |
|---|---|---|---|---|
| December 13, 2019 | $1,533,894.43 | $1,123,319.80 | $23,749.26 | $ 2,680,963.49 |
| February 5, 2020 | $767,519.24 | $367,502.92 | $10,371.42 | $1,145,393.58 |
| February 13, 2020 | $2,888,301.61 | $951,176.84 | $17,473.91 | $3,856,952.36 |
| March 3, 2020 | $658,507.03 | $1,030,497.18 | $16,113.55 | $1,705,117.76 |
| April 18, 2020 | $564,662.92 | $781,758.70 | $11,492.48 | $1,357,914.10 |
| | | | | **$10,746,341.29** |

| Rain Event | Total Claimed | Advance | Amounts Outstanding |
|---|---|---|---|
| December 13, 2019 | $ 2,680,963.49 | $200,000 | $ 2,480,963.49 |
| February 5, 2020 | $1,145,393.58 | $200,000 | $945,393.58 |
| February 13, 2020 | $3,856,952.36 | $200,000 | $3,656,952.36 |
| March 3, 2020 | $1,705,117.76 | | $1,705,117.76 |
| April 18, 2020 | $1,357,914.10 | | $1,357,914.10 |
| | **$10,746,341.29** | **$600,000** | **$10,146,341.29** |

---

suggest that reservations of rights are commonplace in the first-party context." *Id*. Ultimately, it is not necessary to determine whether an insurer can rely on a reservation of rights to preserve defenses in the first-party context because Zurich waived the right to assert the flood deductible as a condition limiting payment before the August 4, 2020 and March 21, 2020 letters. And "[a] general reservation of defenses is wholly ineffective to prevent a waiver that has already occurred." *Sargent*, 165 Ga. App. at 867, 303 S.E.2d at 47.

Doc. 90-25 at 2.  Zurich argues that it "has no payment obligation under the policy" for two reasons.  Docs. 88-1 at 29-31; 112 at 12-13.  First, it is undisputed that First Solar's losses for the February 5, March 3, and April 18 rain events are less than $2,500,000; thus, Zurich argues that First Solar has failed to provide evidence that these rain events exceed the "applicable" deductible.  Doc. 88-1 at 29-30.  Second, Zurich contends that First Solar has no evidence that "Delay in Completion coverage was triggered or that 'general conditions' costs are recoverable under Section I of the policy."  Docs. 88-1 at 29-31; 112 at 12-13.  Without these expenses, First Solar's losses for the December 13 and February 13 rain events are less than $2,500,000.  Docs. 88-1 at 29-31; 112 at 12-13.

Zurich's damages argument rests on the assumption that the $2,500,000 flood deductible applies.  Docs. 88-1 at 29; 112 at 12-13.  However, Zurich does not dispute that First Solar incurred the following damages and losses:

> December 13, 2019 Rain Event – $1,477,618
> February 5, 2020 Rain Event – $418,746
> February 13, 2020 Rain Event – $1,947,934
> March 3, 2020 Rain Event – $496,850
> April 18, 2020 Rain Event – $576,155

Docs. 88-1 ¶ 74; 100-1 ¶ 74.  Because the Court concludes that the deductible is $100,000 and because it is undisputed that First Solar's losses for the five rain events each exceed $100,000, First Solar has provided evidence to create an issue of material fact as to whether Zurich owes additional amounts under the policy.  Accordingly, Zurich's motion for summary judgment that it owes no additional amounts under the policy is **DENIED**.

## C. Bad Faith Claim

Finally, First Solar contends Zurich acted in bad faith when it refused to pay any additional amounts under the policy.  Doc. 100 at 24-29.  "To prevail on its claim for bad faith, [First Solar] must prove that (1) the claims are covered; (2) a demand for payment was made against [Zurich] within 60 days prior to filing suit; and (3) [Zurich's] failure to pay was motivated by bad faith."  *Am. Safety Indem. Co. v. Sto Corp.*, 342 Ga. App. 263, 273, 802 S.E.2d 448, 456 (2017).  First Solar's bad faith claim fails because it did not provide the statutorily required pre-suit notice and Zurich had reasonable grounds to contest the claims.

### 1. *First Solar did not comply with the 60-day pre-suit demand requirement.*

An insured must make a demand to the insurer for payment at least 60 days before filing suit to assert a bad faith claim under Georgia law.  O.C.G.A. § 33-4-6.  First Solar argues that Zurich "knew this lawsuit was coming, including bad faith allegations," based on the parties' "extensive communications" and a May 10, 2021 letter from First Solar requesting that the parties proceed under the policy's dispute resolution procedure.  Doc. 100 at 25-26.  While the bad faith demand need not contain specific or formulaic language, it must, at a minimum, put the insurer on notice that the insured plans to take legal action for bad faith if the demand is not met.  *Cotton States Mutual Ins. Co. v. Clark*, 114 Ga. App. 439, 446-47, 151 S.E.2d 780, 786 (1966).

First Solar's pre-suit communication with Zurich was insufficient to put Zurich on notice that it intended to assert a bad faith claim.  First Solar's letters merely informed Zurich that it "disagree[d]" with Zurich's contention that the claims were caused by "flood" and requested that the parties continue to negotiate a settlement of First Solar's

claims.  *E.g.*, Docs. 88-60; 90-31.  For example, First Solar's October 20, 2020 letter in

response to Klaben's assertion that First Solar's claims should be categorized as "flood"

damage stated:

> [W]e respectfully disagree to the extent your letter suggests that the
> claim(s) at issue fall within the Policy's definition of FLOOD.
>
> …
>
> We look forward to continuing to discuss this loss and reaching a
> resolution soon.  Thank you for your consideration of these points in the
> meantime, and I hope they will be helpful as we move forward.

Doc. 90-31 at 2, 5.  Similarly, in response to Zurich's March 21, 2021 letter—which First

Solar understood as Zurich's "ultimate determination that [Zurich] *was not planning to*

*pay any additional amounts under the Policy*"—First Solar simply stated:

> I have reviewed your March 22, 2021 letter and respectfully disagree with
> your conclusion that these losses from heavy rainfall clearly and
> unambiguously fall within the meaning of "Flood" as that term is defined in
> the Policy.  I also disagree with your suggestion that First Solar's view of
> that issue is unreasonable, particularly when Zurich made prior claim
> payments consistent with First Solar's interpretation.
>
> Given our clients' dispute and Zurich's response, First Solar elects and
> requests to proceed pursuant to the alternative dispute resolution
> procedures set forth in Paragraph 23 of the Policy.
>
> …
>
> There are other details we will obviously need to work through, and we
> look forward to discussing that with you soon.

Docs. 88-60 at 2-3; 102-1 ¶ 85; 115 ¶ 85 (emphasis added).  These letters are

insufficient to provide notice of a bad faith claim.  First, the letters do not contain any

reference to a claim for bad faith, the applicable statute, or state that First Solar was

considering litigation.  *Arrow Exterminators, Inc. v. Zurich Am. Ins. Co.*, 136 F. Supp. 2d

1340, 1355-56 (N.D. Ga. 2001).  Second, "the letter[s] [do] not request that [Zurich] pay

any specific loss"—even though First Solar was aware that Zurich did not intend to pay

any additional amounts under the policy. *Id*. at 1356. Instead, First Solar's pre-suit communication "merely express[ed] general dissatisfaction with the manner in which [Zurich] adjusted claims and disagre[ed] with [Zurich's] contention" that the claims should be categorized as "flood" damage. *Id*. Thus, First Solar's pre-suit communication was insufficient to raise "the additional specter of bad faith necessary to put [the insurer] on notice." *Primerica Life Ins. Co. v. Humfleet*, 217 Ga. App. 770, 772, 458 S.E.2d 908, 910 (1995).

    *2. Zurich had reasonable grounds to contest First Solar's claims.*

    "Penalties for bad faith are not authorized where the insurance company has any reasonable ground to contest the claim and where there is a disputed question of fact." *Lee v. Mercury Ins. Co. of Georgia*, 343 Ga. App. 729, 748, 808 S.E.2d 116, 133 (2017) (quoting *Am. Safety Indem. Co.*, 342 Ga. App. at 273, 802 S.E.2d at 456). "Rather, bad faith is shown by 'evidence that under *the terms of the policy* upon which the demand is made and under the facts surrounding the response to that demand, the insurer had no good cause for resisting and delaying payment.'" *Old Republic Nat'l Title Ins. Co. v. RM Kids, LLC*, 337 Ga. App. 638, 650, 788 S.E.2d 542, 553 (2016) (quoting *Laws. Title Ins. Corp. v. Griffin*, 302 Ga. App. 726, 731, 691 S.E.2d 633, 637 (2010)). "Ordinarily, the question of bad faith is one for the jury." *Am. Safety Indem. Co.*, 342 Ga. App. at 273, 802 S.E.2d at 457. "However, 'when there is no evidence of unfounded reason for the nonpayment, or if the issue of liability is close, the court should disallow imposition of bad faith penalties.'" *Id*. (quoting *Amica Mut. Ins. Co. v. Sanders*, 335 Ga. App. 245, 250, 779 S.E.2d 459, 463 (2015)). "Because the damages are in the nature of a penalty, the statute is strictly construed and the right to such recovery must be clearly

shown." *Fla. Int'l Indem. Co. v. Osgood*, 233 Ga. App. 111, 115-16, 503 S.E.2d 371, 375 (1998).  Summary judgment is appropriate "where the insurer has reasonable grounds to contest the claim or the question of liability is close."  *Id*.

Even if First Solar had complied with the pre-suit demand requirement, First Solar's claim for bad faith penalties fails because Zurich had reasonable grounds to contest First Solar's claims.  As discussed previously, Zurich's conclusion that First Solar's losses resulted from five separate occurrences of flood was the correct application of the unambiguous policy language to the undisputed facts.  Although the Court also concludes that Zurich waived its deductible position as a matter of law, the Court is unaware of any authority directly addressing whether a deductible is a waivable condition to payment.  Thus, Zurich's conclusion that it did not owe any additional amounts under the policy was reasonable.  *Osgood*, 233 Ga. App. at 116, 503 S.E.2d at 375 (declining to hold that the insurer's waiver of its legal defense was evidence of bad faith because the issue of whether there was waiver was "a close question"); *Schoen v. Atlanta Cas. Co.*, 200 Ga. App. 109, 110, 407 S.E.2d 91, 92 (1991); *Ga. Int'l Life Ins. Co. v. Harden*, 158 Ga. App. 450, 454-55, 280 S.E.2d 863, 866-67 (1981).  Accordingly, Zurich's motion for summary judgment on First Solar's bad faith claim is **GRANTED**.

## IV.  CONCLUSION

In sum, there are genuine issues of material fact as to whether Zurich waived the suit limitation clause.  Thus, summary judgment on this ground is improper.  Regarding the applicable deductible, the Court concludes that: the policy's definition of "flood" is unambiguous; the undisputed facts establish that First Solar's losses resulted from five separate "occurrences" of "flood"; and the flood deductible is $2,500,000.  However, the

deductible is a waivable condition to payment and the undisputed facts demonstrate that Zurich waived its deductible position as a matter of law.  Finally, summary judgment is proper on First Solar's bad faith claim because it did not comply with the pre-suit notice requirement and Zurich had reasonable grounds to contest the claim.

Accordingly, First Solar's motion (Doc. 90) is **GRANTED in part** and **DENIED in part** and Zurich's motion (Doc. 88) is **GRANTED in part** and **DENIED in part**.  The parties are **ORDERED** to confer and file a joint status report by **July 8, 2024**, regarding the impact of this Order on the motions to strike (Docs. 61; 63; 65; 68; 70).

**SO ORDERED**, this 24th day of June, 2024.

<u>S/ Marc T. Treadwell</u>
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT